UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHARLES TILLAGE, et al.,<br><br>    Plaintiffs,<br><br>    v.<br><br>COMCAST CORPORATION, et al.,<br><br>    Defendants. | Case No. 17-cv-06477-VC<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. No. 129 |

Tillage and Loomis are Comcast customers. Their claims under California statutes and common law arise from what they say is Comcast's deceptive scheme of promising a flat-rate price for cable and internet services up front but failing to disclose certain fees—and the fact that those fees can increase over the course of the contract—until after the consumer has already committed to their chosen plan. For the reasons explained below, Comcast's motion for summary judgment as to Tillage's and Loomis's statutory claims is denied. Its motion as to their claims for breach of contract is granted.

## Statutory Claims

Tillage and Loomis each brought claims under California's Unfair Competition Law, False Advertising Law, and Consumers Legal Remedies Act. To prevail on each of these claims at trial, the plaintiffs will have to prove essentially the same three elements: that they suffered some economic injury, that Comcast engaged in a deceptive or unfair practice, and that the

deceptive practice caused their injury.[1] When, as here, the deceptive practice takes the form of misrepresentation, proving causation requires showing that the plaintiffs reasonably relied on that misrepresentation in deciding to purchase Comcast's services. *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 326 (2011). At the summary judgment stage, the question is whether a reasonable jury could infer from the evidence in the record that each of these elements was met.

With respect to the first element, a jury could readily conclude that Tillage and Loomis each suffered the same economic injury: each bought a service plan that turned out to be more expensive than they expected. Receiving the advertised cable services required paying two fees above and beyond the advertised "sticker price:" the Broadcast TV Fee and the Regional Sports Fee. Unlike government taxes and surcharges (which any reasonable consumer might expect), Comcast charges these fees to defray the costs of providing what a reasonable consumer would expect he is already paying for when he buys a cable package—the channels within the package that show regional sports and broadcast television.

As to the second and third elements, misrepresentation and causation, the record is specific to each plaintiff. And it is somewhat messy, particularly with respect to reliance. Comcast's strongest argument for summary judgment centers on the existence of a Minimum Term Agreement, a contract that discloses the two challenged fees (and the fact that they could increase within the two-year period) among other plan terms and limits. The Ninth Circuit, following California courts, treats customers who have signed a contract as having read it, because signing a contract without first reading it is categorically unreasonable. *Davis v. HSBC Bank Nevada, N.A.*, 691 F.3d 1152, 1163 (9th Cir. 2012). Here, if Tillage and Loomis each plainly signed the Agreement, the Court would have to rule as a matter of law that they did not

---

[1] For purposes of the False Advertising Law claim, the deceptive practice must be in the form of advertising. Comcast asserts that statements made by customer service representatives in response to inquiries by individual consumers do not constitute "advertising," but the California Supreme Court has held that the law does encompass statements made under closely analogous circumstances: a bank officer discussing the terms of an individual loan. *Chern v. Bank of America*, 15 Cal. 3d 866, 875-76 (1976). The statements made to both plaintiffs by various customer service representatives in the course of signing up for their plans (as described below) therefore satisfy that requirement.

reasonably rely on any representation that their service plans would not require them to pay the two challenged fees. But on this record, the circumstances surrounding the Agreements associated with each plaintiff's service plan raise genuine fact issues as to whether either Tillage or Loomis actually "signed" the Agreement or otherwise assented to its terms. It's a close question whether these plaintiffs can survive summary judgment, but ultimately their quirky fact patterns do not allow a ruling in Comcast's favor as a matter of law.

**Tillage** had Comcast services at one property beginning in 2014, and for about two years was receiving and paying bills that listed the Broadcast TV Fee as an additional charge. In 2016 he moved and signed up for a new Comcast plan at his new apartment, and it is the terms of that plan he challenges here. Tillage first signed up for internet and cable service through a representative assigned to his complex, and although the details of that conversation are not in the record, the transcripts of subsequent calls with Comcast representatives suggest that he came away from that first interaction feeling bamboozled. On June 6 he called and spoke with a representative named Cathy, who explained that his new plan was a 24-month contract priced at $129.99 per month, and that he could cancel at no cost within 30 days of having signed up. Cathy also helped Tillage schedule the equipment installation for his new plan on June 14. Tillage then received two confirmation emails, one dated June 14 and the second dated two days later. Both emails listed a total amount for "taxes, surcharges, and fees" and each provided a link to view the Agreement associated with Tillage's plan. From the record produced by Comcast, that Agreement was generated on May 27 when Tillage first signed up through his complex representative, but Tillage denies having ever received a hard copy or clicking on the emailed link to view it. On June 16, Tillage also received his first billing statement, which explicitly listed both the Broadcast TV Fee and the Regional Sports Fee. Finally, on July 2, Tillage called Comcast once more, this time speaking with a representative named David. He complained that the bill he received was for $142, rather than the $129.99 he expected. David explained that there was a $10 charge for his internet modem but did not discuss other fees. Ultimately, Tillage decided to keep his plan, even though at that point he was within the 30-day period and could

have cancelled for free.

From this record, a reasonable jury could find that Comcast made a material misrepresentation by omission when Cathy told Tillage that the plan would cost $129.99, when in fact it would cost more because of the two challenged fees. Whether the jury could find that Tillage reasonably relied on that misrepresentation is a much closer question, but ultimately there is no evidence in the record that Comcast disclosed the fees at any point before Tillage was, as a practical matter, committed to the plan. Although it is certainly relevant that he was paying the Broadcast TV Fee for two years before signing up for the current plan, the record does not reflect what he was promised with respect to the terms of the 2014 plan when he first signed up for it. Without knowing the details of that conversation, the Court cannot definitively find that he should have known to expect that fee to be charged on his new 2016 plan.

With respect to the Agreement, it does not bear Tillage's signature, and the record only shows that it was available to him by clicking the link in the confirmation emails. But Tillage only received the first of those emails the day of his equipment installation, after he had spent a considerable amount of time going through the process of signing up and scheduling the installation. The same goes for his first billing statement: even though Tillage received it and was therefore on notice of the added fees before the end of his 30-day cancellation period, that disclosure came much too late to save him the headache of getting set up for service. Therefore it cannot be said that his decision to continue with the current plan, rather than bear the temporal and emotional costs of switching to either another provider or a lower-priced Comcast plan, destroys the inference of reasonable reliance on Cathy's upfront representation of the monthly cost.

**Loomis** first signed up for Comcast's services on June 19, 2016 through a salesperson at a Verizon store, but like Tillage the record reflects that he was left frustrated by this first interaction.[2] On June 20 he entered an online chat with Comcast customer service representative

---

[2] The only evidence of that initial encounter in the record is a confirmation sheet Loomis says he was handed. Although the sheet discloses both fees in small print at the bottom of the page, there

4

Nikko, who cancelled the order Loomis had placed at the store and then described to him a series of different internet and cable packages available at different price points. In discussing one of those packages, Nikko explained that the top-line price was "a package rate and does not include taxes and fees." When Loomis asked what "fees" were involved, Nikko responded that "Fees will include your modem rental, DVR rental, and alike." The next day, Loomis chatted with another representative, Eunice, and decided to sign up for a new plan with a monthly rate of $79.99. When it came time to complete the order, Eunice told Loomis to follow a link to a webpage (without specifying what the webpage contained) and then do the following: "For the ORDER ID NUMBER, please Click the Calendar Icon and choose the date today. Please, provide to me the TRANSACTION ID NUMBER that appears on the next page so I can finalize your order." Loomis followed the link, which took him to a copy of the Agreement. He apparently viewed at least some of the Agreement because he asked Eunice a question about the mandatory two-year term disclosed in bold font at the top of the page. With that question answered, he seems to have followed the remaining instructions and provided Eunice with a transaction ID number. Eunice then confirmed that, all-in, his new monthly rate would be $89.99 "before taxes." Later that day, Loomis entered yet another chat with a billing representative named Surinder, apparently upset that his new rate was $89.99 rather than the $79.99 Eunice had originally stated as the price for the package he selected. Surinder explained that there was a $10 monthly fee for HD service, and after some grumbling from Loomis agreed to waive that fee for the next 12 months. Surinder then confirmed that "with these changes, your monthly bill would be $79.99/mo + tax for the next 12 months."

  As with Tillage, a reasonable jury could find that Comcast made a material misrepresentation when Eunice told Loomis that the monthly price would be $79.99 without

---

is so much scribbling and crossing-out of terms all over the page that it cannot be said to clearly disclose much of anything. At any rate, because Loomis canceled this first plan upon discovering that it would cost much more than the Verizon representative told him, the confirmation is not relevant to the plan he challenges here—the one he ultimately signed up for through online chats with Comcast agents.

5

disclosing the two challenged fees. But the question of whether a jury could find that Loomis reasonably relied on that misrepresentation is even closer than with Tillage. Unlike Tillage, there is no doubt that Loomis was presented with the Agreement at the time he signed up for his plan, and the copy of the Agreement produced in discovery has Loomis's name written in next to a date. Additionally, the button next to the option "Accept Agreement Terms" has been filled in. On almost any other record, these facts would be fatal to Loomis's claims in light of the *Davis* rule. But the very particular circumstances presented by this record raise a genuine issue of fact as to whether Loomis actually consented to the terms of the Agreement. Eunice's instructions in the chat did not describe "signing" or "agreeing to" the terms of the contract—she simply told Loomis to click a date on a calendar and then provide a transaction number. At his deposition, Loomis testified that he did not recall writing his name on the Agreement and thought that Comcast had probably pre-populated it for him. When asked whether he had clicked the button next to "Accept Agreement Terms," Loomis said "presumably" but did not affirmatively recall having done so. Taken as a whole, a reasonable jury could infer from these facts that a reasonable consumer in Loomis's position would not have necessarily understood that, by doing as Eunice instructed, he was binding himself to the terms of the Agreement. The *Davis* presumption that a reasonable consumer would read a contract before signing it therefore does not apply, and the issue of whether the fees were actually disclosed to Loomis before he signed up for his plan remains a contested issue of fact that must be decided by the jury.

**Breach of Contract Claim**

Summary judgment must be granted as to the breach of contract claim because, as described above, the Agreement plainly disclosed the Broadcast TV Fee and the Regional Sports Fee and that those fees could increase over the contract term. The plaintiffs' arguments that their contracts with Comcast consist only of the promises made to them in the various chats and emails with customer representatives are absurd. Any reasonable consumer would understand that a contract for two years of cable and internet service would include written terms and

conditions, and in this case the Agreement plainly forms at least part of that writing. Since the written contract requires customers to pay the two challenged fees in addition to the top-line price, the fact that Comcast actually charged those fees cannot constitute a breach.

**IT IS SO ORDERED.**

Dated: May 28, 2021

_____
VINCE CHHABRIA
United States District Judge